## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

                                \*

       **vs.**                          **Case No.   19-cr-00604-PWG-1**

                                \*

**Kyrie Rashaud Thompson**

                                \*

\*\*\*\*\*\*

### MEMORANDUM

On May 27, 2020, Defendant filed a Motion for Detention Hearing and Order [For] Pretrial Release (ECF No. 51). Defendant's written pleading was largely dedicated to arguing that the general conditions of confinement at the Chesapeake Detention Facility ("CDF"), where he is currently detained, raise his risk of contracting the COVID-19 virus so as to justify his release. On May 29, 2020, the Government filed a written opposition. (ECF No. 54). On June 1, 2020, this Court held a hearing on Defendant's motion. As announced at the hearing, Defendant's motion is **DENIED**. In addition to the Court's comments at the hearing (which are incorporated by reference), following is the Court's rationale.

Matters of pretrial detention are governed by the Bail Reform Act, 18 US.C. § 3141, et seq. (the "BRA"). The BRA focuses the Court's inquiry on two issues: (1) a defendant's risk of nonappearance; (2) the danger that the defendant's release would pose to other individuals. *Id*. at § 3142(f). Congress then specified the criteria that this Court must weigh when assessing those two issues. *See* 18 U.S.C. § 3142(g). As this Court recently observed, none of those factors refers specifically to whether the conditions of detention threaten the defendant's well-being given his health status. *United States v. Gallagher*, 19-479-SAG (ECF No. 34; 5/22/20).

That said, a defendant's physical and mental condition can be relevant to a § 3142(g) assessment. *See* § 3142(g)(3)(a). For example, a defendant with certain intractable mental health issues that are not easily managed might be less able to comply with release conditions or be counted on to appear reliably for court. A defendant with a chronic health issue requiring regular therapy, such as kidney dialysis, might be less of a flight risk. A defendant in fragile health or with impaired mobility might be less likely to flee and also pose less of a threat if released. In the context of the current COVID-19 pandemic, a defendant with increased risk of developing complications should he contract the virus might be more compliant with release conditions that lessen community contacts or might avoid violations so as not to risk re-detention. This factor, of course, would need to be considered with all other factors set forth in § 3142(g).

Further, a defendant's health risk from detention (including COVID-19 risk) might, under appropriate circumstances, support temporary release under § 3142(i). *See, e.g., United States v. Creek,* 19-036-CCB (ECF No. 421; May 1, 2020) (granting temporary release from the D.C. Jail complex due to defendant's underlying health conditions). In such a motion, the burden is on the defendant to show that those health concerns are "compelling," outweigh the other 3142(g) factors, and that the defendant's release does not, in turn, pose an increased health risk to the community. *See, e.g., United States v. Clark,* 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020); *see also*, *Creek, supra,* ECF 402 (April 15, 2020) (directing the District Court to consider "in the first instance the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a 'compelling reason' for temporary release under 18 U.S.C. § 3142(i).").

In rare circumstances, an individual's health risk given the conditions of confinement at a particular facility might even transcend the BRA and implicate Fifth Amendment protections afforded detained individuals so as to justify release on constitutional grounds, although a more appropriate procedural posture to address overall conditions of confinement would be a civil rights lawsuit or perhaps habeas petition against the officials managing the facility. In that setting, a more typical remedy would be an order for changes in those conditions of confinement or perhaps transfer, rather than release. *See, e.g., Banks, et al v. Booth, et al.*, 2020 WL 1914896 (D.D.C. 4/19/20), at *13-16 (court ordering changes in conditions of confinement at detention facility after finding a likelihood of Fifth and Eighth Amendment violations relating to COVID-19 in entering temporary restraining order against officials running D.C. Jail).

When not explicitly part of the BRA framework as described above, arguments regarding constitutional violations that are common to all detainees at a facility[1]—whether based on the Fifth, Sixth, or Eighth Amendments--are not well suited for a detention hearing for several reasons. Most fundamentally, the presence of such violations would prompt the Court to consider remedies short of release (as in *Banks, supra*), yet the parties who could potentially provide such remedies—the officials who run the facilities--are not before the Court. Similarly, there are jurisdictional limitations on the ability of an Article One United States Magistrate Judge to address constitutional deprivations by such officials in the absence of a consent proceeding or appropriate District Judge referral. Additionally, the absence of a full array of discovery tools in a preliminary criminal proceeding prevents a full record from being developed. Further, in the detention hearing posture, there is obvious tension between scheduling a timely hearing (here, within four days of Defendant's request) yet providing enough time for the parties to investigate,

---

[1] For example, pleadings incorporating many of these very same arguments are currently before Judge Sullivan of this Court in *United States v. Patterson*, TJS 20-1078 (ECF No. 35). This is by no means inappropriate but does underscore that many of the issues raised by Defendant are issues common to other (and perhaps all) detainees at CDF.

retain experts, and otherwise develop their respective arguments.   In sum, remedying facility-wide constitutional grievances common to many detainees cannot be optimally addressed in the context of a limited preliminary proceeding such as a detention hearing.

Accordingly, the Court limits its decision to the BRA and, in particular, the factors set forth in § 3142(g) as they relate to risk of nonappearance and the danger release would pose to the community, and, alternatively, a consideration of temporary release under § 3142(i), both in the setting of COVID-19.

1.   Section 3142(g) Analysis

It must be noted that when this matter was originally charged, it was charged as a simple assault on the Court's misdemeanor docket, although the supporting affidavit for that criminal complaint is based on the same facts that ultimately gave rise to the current felony kidnapping charges.  *Compare* 19-TMD-3347, ECF No. 1-1 *with* 19-PWG-604, ECF No. 1-1).  In the misdemeanor case, on October 21, 2019, Defendant had a full detention hearing where Judge Gina Simms of this Court carefully considered the § 3142(g) factors and ordered Defendant detained. (A transcript of that hearing is attached to the Government's Opposition, ECF No. 54-1).   While Defendant is entitled to a new detention hearing given the Government's dismissal of that matter when it re-charged the conduct as felony kidnapping, resulting in a "new" case, Judge Simms' observations and conclusions, though not binding, are noteworthy.

Those traditional factors are no less compelling here.  They are detailed in the Government's Opposition. (ECF No. 54 at 5-10).  In summary, the nature of these allegations is disturbing.  Defendant is alleged to have physically threatened and choked the mother of his then three-year-old child, forcing her to drive to a secluded area and perform oral sex while the child remained in the car.  There is strong evidence that Defendant took photos of this act and texted one to the victim's current partner.  Further, there was physical evidence from the scene

consistent with the act as alleged, bruising on the victim's neck, and email messages underscoring the volatile nature of their relationship, and showing examples of other threats of violence Defendant made both before and after the occurrence.  Thus, the nature of the allegations and strength of the proffer are strongly in the Government's favor.  Defendant's criminal history not only includes the first-degree assault conviction, but at least seven other convictions, including drug offenses.  Defendant violated his supervised release conditions when released from jail on his felony conviction, and the supervision ended unsatisfactorily. Additionally, even after his arrest and detention, Defendant violated a "no-contact" order from Judge Grimm of this Court by continuing to contact the victim.  In short, none of the traditional factors weigh in Defendant's favor, and Pretrial Services has also continued to recommend detention.

The Court does not find that COVID-19 alters the § 3142(g) analysis at all.  Defendant now asserts that he has "sinus and respiratory challenges typically triggered by allergies."  (ECF No. 51 at 5).  This contradicts the information he provided to Pretrial Services when he was originally interviewed that he was in excellent physical health with no medical problems. Moreover, even assuming Defendant does suffer from sinus and respiratory challenges triggered by allergies, Defendant offers no support that such a condition puts him at increased risk for complications should he contract the virus.  Though counsel analogized these conditions to asthma which, when moderate or severe, has been included by health authorities as an at-risk condition, there is no information that Defendant has never been diagnosed with or treated for asthma.  By all appearances, Defendant is a healthy 25-year old male who would statistically be at low risk for complications should he contract the virus.  This does not give the Court any confidence that COVID-19 concerns would significantly enhance Defendant's compliance with

release conditions, especially given his prior poor track record on supervision and in complying with orders of this Court meant to limit certain behaviors.

2.   Section 3142(i) Analysis

As outlined in *Clark*, *supra*, a court's analysis in assessing whether a defendant has proven a "compelling" reason for temporary release in the setting of COVID-19 involves determining whether the health risk to a defendant from his continued detention outweighs both the traditional § 3142(g) factors and the health risk to the community that he would pose if released.   Looking at Defendant's health risk, this Court is not indifferent to the enhanced risk of viral transmission in any custodial situation, including detention facilities. It appears, however, that CDF has taken a comprehensive set of precautionary measures to protect its staff and its residents, as outlined in great detail by the Government.  (ECF No. 54 at 11-14).   Defendant questions the extent to which such measures have been effectively implemented, and urges that other measures are necessary to minimize the spread of COVID-19.  (ECF No. 51 at 5-19).

From the record presently before this Court, it appears that whatever measures have been implemented at CDF have been effective.  To date, now almost three months into the pandemic, CDF has had only six known positive COVID-19 tests among staff, contractors and inmates. Significantly, only one involved an inmate,[2] who contracted the virus prior to arriving at CDF, has recovered, and has returned to the general population.  According to the Government, contact tracing was done in response to these cases to help prevent community spread and no additional cases have been identified.  (ECF No. 54 at 14).  In addition to these measures, on May 20, 2020, Governor Larry Hogan, announced universal COVID-19 testing at all state-run correctional and juvenile facilities, including CDF, which can only help prevent further transmission.[3]

---

[2] According to the Government, there was an additional inmate who tested positive prior to arriving at CDF, but who did not test positive at the facility.

[3] Pamela Wood & Phillip Jackson, "Maryland to test all detainees, staff at prisons and juvenile facilities for coronavirus," *Baltimore Sun* (May 20, 2020), https://www.baltimoresun.com/coronavirus/bs-md-prison-testing-20200520-

In addition to failing to establish that he has an underlying medical condition that would make him particularly susceptible to COVID-19 complications should he contract he virus, Defendant has also not supported his argument that, should he contract the virus, he will not have adequate access to medical care.  As the Government notes, there are multiple points of access for detainees with chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses.  *Id.* at 15-16.  DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for asthma therapy and other chronic diseases.  *Id.*  In addition, clinical pharmacists are on call at all times, day or night.  *Id.*  If the defendant should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.  *Id.*

Defendant argues that the conditions of CDF relative to COVID-19 are comparable to those at the D.C. Jail complex where some federal detainees are housed.  (ECF No. at 19-20). The Court disagrees.  Apart from the obvious difference that the two facilities are supervised by two different agencies in two different jurisdictions, the experiences in the two facilities relative to COVID-19 are vastly different.  As noted above, the conditions at the D.C. Jail are the subject of a pending class action lawsuit being supervised by U.S. District Court Judge Colleen Kollar-Kotelly of the U.S. District Court for the District of Columbia, assisted by court appointed monitors.  In comparison to CDF's one inmate who tested positive upon arrival from another facility, the D.C. Jail during the same time period has had well over 150 cases and one death. Moreover, notwithstanding finding likely constitutional violations at that facility, Judge Kollar-

wroxapcoljbrvmv7lcsh4vm2e-story.html.

Kotelly has not ordered the release of any inmates at the D.C. Jail based on those conditions but instead has focused on remedying such violations.

Further, Defendant has not established that his release will not increase the COVID-19 risk in his community. While he has proffered a third-party custodian and residence that would otherwise appear to be acceptable, Defendant's record on compliance (including with previous orders of this Court) is not good. Defendant's risk to the community is intimately linked to his compliance with the directives of government officials and public health professionals regarding COVID-19, and the Court is simply not satisfied that such compliance is likely.

Finally, Defendant argues that Sixth Amendment concerns regarding impaired access to counsel support release. The BRA does contemplate that a defendant will have reasonable access to counsel. § 3142(i)(3). And § 3142(i)'s temporary release provisions do contemplate that an acute need to assist in one's defense might also satisfy the provision. But "reasonableness" must be judged in the proper context—here, a global pandemic. The very measures that Defendant urges to protect detainees from infection necessarily will impact the ability of lawyers and their client to meet. Fortunately, given that this Court is still restricting operations largely to emergency criminal matters, it is unlikely that any significant proceedings will be scheduled in Defendant's case until that status changes. Defendant has made no argument as to a specific upcoming event that might support a temporary release to prepare with counsel pursuant to 3142(i). Under similar circumstances, Judge Ellen Hollander of this Court observed in *United States v. Lee*, 2020 WL 1974881 at *8 (D. Md. April 24, 2020), "[A]ny strain imposed on the attorney-client relationship due to the coronavirus does not mandate release."

Accordingly, Defendant's Motion is DENIED.

 6/1/2020

Date

J. Mark Coulson
United States Magistrate Judge

